## M. J. SHOBE v. J. H. SMITH.

(158 N. W. 1065.)

On appeal from a judgment of dismissal entered upon a motion for judgment for defendant notwithstanding the verdict for plaintiff, the evidence is reviewed, and it is *held:*

Judgment — appeal — motion for judgment — verdict — notwithstanding — evidence — action — cause of — executed sale — lands — proceeds — application of.

That the testimony of plaintiff and his witnesses wholly fails to establish any cause of action in plaintiff, and affirmatively discloses an executed sale of land at a specified price per acre, with proceeds of purchase price to be applied upon an existing indebtedness owing defendant from plaintiff. Upon his own testimony and that of his witnesses, his cause of action should have been dis-

Note.—Upon the question of right to judgment *non obstante veredicto* because of failure of proof, see note in 12 L.R.A. (N.S.) 1021, where cases are collected showing the relation of the common-law rule that a motion for such a judgment was never permissible on the part of the defendant.

missed at the close of the case, as there was no issue of fact for submission to the jury. As there was nothing upon which to base the verdict in plaintiff's favor, judgment for defendant notwithstanding said verdict was properly ordered.

Opinion filed June 8, 1916.

From a judgment of the District Court of Ramsey County, *Buttz,* Judge, dismissing plaintiff's action, he appeals.

Affirmed.

*W. M. Anderson* and *Fred R. Stevens,* for appellants.

The law of this state is settled, that before a judgment notwithstanding the verdict can be entered, the defense or cause of action must be defective in matter or substance, and beyond the power of amendment. Richmire v. Andrews & G. Elevator Co. 11 N. D. 454, 92 N. W. 819; 2 Enc. Pl. & Pr. 912, and cases cited; Nelson v. Grondahl, 12 N. D. 130, 96 N. W. 299; Welch v. Northern P. R. Co. 14 N. D. 19, 103 N. W. 396; Pease v. Magill, 17 N. D. 166, 115 N. W. 260; Johns v. Ruff, 12 N. D. 74, 95 N. W. 440; Ætna Indemnity Co. v. Schroeder, 12 N. D. 110, 95 N. W. 436; Meehan v. Great Northern R. Co. 13 N. D. 432, 101 N. W. 183; Kerr v. Anderson, 16 N. D. 36, 111 N. W. 614; Houghton Implement Co. v. Vavrosky, 15 N. D. 308, 109 N. W. 1024.

A fact or question which was actually and directly in issue in a former suit, and was there judicially passed upon and determined by a domestic court of competent jurisdiction, is conclusively settled by a judgment therein as to the parties and those in privity with them. 23 Cyc. 1215; Ottow v. Friese, 20 N. D. 86, 126 N. W. 503; Borden v. McNamara, 20 N. D. 225, 127 N. W. 104, Ann. Cas. 1912C, 841.

*Middaugh, Cuthbert, Smythe, & Hunt,* for respondent.

"Where it is clear upon the whole record that the moving party is entitled to judgment as a matter of law," the motion should be granted. Richmire v. Andrews & G. Elevator Co. 11 N. D. 453, 92 N. W. 819; 2 Enc. Pl. & Pr. 912, and cases cited; Cruikshank v. St. Paul F. & M. Ins. Co. 75 Minn. 266, 77 N. W. 958; Marquardt v. Hubner, 77 Minn. 442, 80 N. W. 617; Bragg v. Chicago, M. & St. P. R. Co. 81 Minn. 130, 83 N. W. 511; Merritt v. Great Northern R. Co. 81 Minn. 496, 84 N. W. 321, 9 Am. Neg. Rep. 61.

A motion for judgment will never be granted where there was or is an issue for the jury to pass upon. There must, however, be some substantial fact, one of some probative force. Mt. Adams & E. P. Inclined

R. Co. v. Lowery, 20 C. C. A. 596, 43 U. S. App. 408, 74 Fed. 463; Felton v. Spiro, 24 C. C. A. 321, 47 U. S. App. 402, 78 Fed. 576, 2 Am. Neg. Cas. 682; Travelers' Ins. Co. v. Randolph, 24 C. C. A. 305, 47 U. S. App. 260, 78 Fed. 754; Minahan v. Grand Trunk Western R. Co. 70 C. C. A. 463, 138 Fed. 37; Coulter v. B. F. Thompson Lumber Co. 74 C. C. A. 38, 142 Fed. 706; Grand Trunk R. Co. v. Ives, 144 U. S. 408, 36 L. ed. 485, 12 Sup. Ct. Rep. 679, 12 Am. Neg. Cas. 659.

A mere scintilla of evidence is not sufficient to require the submission of a case to the jury. People v. People's Exch. 126 Ill. 466, 2 L.R.A. 340, 18 N. E. 774; Grube v. Missouri P. R. Co. 98 Mo. 330, 4 L.R.A. 778, 14 Am. St. Rep. 645, 11 S. W. 736; Finney v. Northern P. R. Co. 3 Dak. 270, 16 N. W. 500; Orleans v. Platt, 99 U. S. 677, 25 L. ed. 404; Pence v. Langdon, 99 U. S. 578, 25 L. ed. 420, 13 Mor. Min. Rep. 32; Marion County v. Clark, 94 U. S. 278, 284, 24 L. ed. 59, 61; Hendrick v. Lindsay, 93 U. S. 143, 23 L. ed. 855; Akin v. Johnson, 28 N. D. 205, 148 N. W. 535; Pleasants v. Fant, 22 Wall. 116, 121, 122, 22 L. ed. 780, 782, 783.

Where the evidence shows conclusively that on a new trial plaintiff would be unable to establish that he ever had the ability required to perform the contract, the motion was properly granted. McVeety v. Harvey Mercantile Co. 24 N. D. 245, 139 N. W. 586, Ann. Cas. 1915B, 1028; Miller v. Bank of Harvey, 22 N. D. 538, 134 N. W. 745; Houghton Implement Co. v. Vavrosky, 15 N. D. 308, 109 N. W. 1024; Meehan v. Great Northern R. Co. 13 N. D. 432, 101 N. W. 183; Welch v. Northern P. R. Co. 14 N. D. 19, 103 N. W. 396; Ætna Indemnity Co. v. Schroeder, 12 N. D. 120, 95 N. W. 436.

Goss, J. This is an appeal from a judgment of dismissal entered upon a motion for judgment *non obstante* after a verdict for the plaintiff. If there was any substantial conflict in the testimony properly receivable upon the issues for trial, dismissal was error.

The complaint recites that for a cause of action on July 15, 1911, plaintiff was the owner and in possession of two tracts of land, a half section in twenty-eight, and 133 acres in section twenty-seven, in a township in Ramsey county. "That plaintiff was owing defendant various sums of money, and defendant made an offer to the plaintiff that if he would give him a deed to the half section and re-

34 N. D.—22.

linquish his interest to the other tract and one half of the crop raised on said land for that year, defendant would assume all of the debts of every description which said plaintiff owed *on the land and to the defendant,* and pay plaintiff *in addition thereto the sum of $900,* as a settlement in full of their mutual accounts, when transfer was made of said land. That plaintiff immediately accepted said offer, and on October 6, 1911," conveyed the same to defendant. "That by reason thereof there is now due and owing from the defendant to the plaintiff $900, of which payment has been demanded and refused." The answer is a general denial coupled with an allegation of purchase of said land by defendant at $27.50 per acre for the half section, and $30 per acre for the 133-acre tract; that encumbrances in the sum of $3,230.47 were against the half section, which left a balance of $5,569.53 to be applied upon plaintiff's indebtedness to defendant; that upon the 133-acre tract there was due to others $2,929.48, leaving the value of plaintiff's equity therein $1,060.52 at the contract price of $30 per acre, or $3,990 therefor. Further, on the transfer of said land to him, defendant credited plaintiff on debts owing him specified certain amounts, which still left a balance due defendant from plaintiff of $2,814, for which a note dated January 2, 1912, was given and secured by chattel mortgage. As a matter of counterclaim, defendant alleges plaintiff executed his note to him for $45 and interest from July 11, 1912, which is due and unpaid; and that between May 10, 1912, and January 24, 1914, various loans and advances on account were made by defendant to plaintiff in the further sum of $424.73. He demands judgment for the amount of said counterclaims and for a dismissal of plaintiff's cause of action.

Is there any substantial proof that the contract of sale was made as is set forth in plaintiff's complaint, for a satisfaction of "all of the debts of every description which said plaintiff owed *on the land and to the defendant,* and to pay the plaintiff in addition thereto the sum of $900, as a settlement in full of their mutual accounts;" or does the uncontradicted evidence establish that the sale was for so much per acre, to be applied upon indebtedness owing by plaintiff to defendant, as claimed by defendant.

Plaintiff's version of the transaction, on direct examination, is given by him in the following language:

Smith "said, 'I come up here for the purpose of seeing if you wanted

to sell that land,' and I told him I did. 'Well,' he says, 'I tell you what I will do; I have got it all figured out here, and I tell you what I will do,—I will clear your personal property,' he says, 'that I hold against you and I will also give you $900 in money,' he says; and I sanctioned it. He said I could have half the crop and he would take the other half. There was a mortgage against my horses for about $2,800 or $2,730 and interest. He made a memorandum at the time, had it with him, and took it away with him. He made no statement as to how much he claimed I was owing him; that we didn't need to be in a hurry about drawing the deeds up. He would let me know when he wanted to draw the deeds. The Missus and Claude and Lena, my two children, were present at the house when this deal was made. In October, 1911, my wife and I went to defendant's bank and executed the deeds. Then he says, 'That old mortgage I will hold for you in order to keep other men from coming in and taking your property away from you,' and I thanked him for it. I delivered to Smith one half of the crop that was raised on the land that year, and relinquished to him the Bursell land" (the 130-acre tract held under contract). Cross-examination brought out the fact that plaintiff was owing many other people considerable amounts.

And testifying as to the transactions at the time of the transfer, the following questions were asked and answers given:

Q. However, Mr. Smith was to clean up all your mortgage indebtedness, was he not?

A. Yes.

Q. That is the deal as you understand it?

A. That is correct.

Q. Then he was to clean up all of your mortgage indebtedness, was he?

A. Yes.

Q. At the time you and Smith were talking over this deal, was there not any understanding, Mr. Shobe, about how much an acre this was going to amount to?

A. Yes.

Q. What was it?

A. $27.50 for the two home quarters, and $30 for the Bursell quarter, as we always called it.

Q. Smith agreed to give you, or allow you, $27.50 for the one-half section?

A. Yes.

Q. And $30 an acre for the 133 acres, or Bursell land?

A. Yes.

Q. When you had this talk with Smith and he agreed to give you the $27.50 for the half section, and the $30 an acre for the 133 acres, did you also figure over the indebtedness you had?

A. Well, I didn't. He did. That is he said he did.

Q. You had debts aside from those that you were owing Smith, did you not?

A. Yes.

Q. And you know whether or not Smith at that time, when he was figuring over this deal with you, in June, 1911, knew of these debts and obligations you owed?

A. Well, I can't say positively, but I judge he did; they were all in Crary.

Q. Didn't you have a pencil and paper there doing any figuring on this deal?

A. No.

Q. Didn't you keep any memorandum of account of these transactions with Smith during all these years?

A. No, sir. I am a man that can't figure. Smith kept the books.

Then testifying next morning in response to questions asked him by the court before his own testimony in his main case was finished, he gives another altogether different version of the sale, upon a price per acre basis, in the following testimony:

Examination by the court:

Q. Mr. Shobe, I want to get this clear in my mind. You say the offer that Mr. Smith made you about buying you out was made in 1911 the day he came out there, early in the morning?

A. Yes, 1911.

Q. And now that was the first talk you had with him about his buying, was it?

A. Yes.

Q. He came out there,—and what was the talk again between you and him, and what did he say to you, and what did you say to him? Tell the talk back and forth now as you remember it.

A. He says, "I come out here and I thought if you still wanted to sell this land, I would take it," he says. "I will give you $27.50 an acre," he says, "for the two home quarters, and I will give you $30 an acre for the Bursell quarter;" and he says, "That will clean up everything that I have against you." He says, "And I will give you $900 on the Bursell quarter," "and," he says, "you can live on it and pay the debts you have, too," and I says, "Yes, sir." He says, "Remember that I get my half the crop," and then we went into the house.

Q. I thought you testified last night that the conversation was that Mr. Smith said he would take your stuff and give you $900; take your property and half the crop, and give you $900,—isn't that what you testified to last night?

A. Take my half the crop.

Q. Didn't you testify last night that he was to have your property and half the crop and give you $900?

A. Yes, sir. He was to release my stuff that he had a mortgage on it.

Q. But didn't you testify that way last night?

A. *No, sir; I don't think I did.*

Examination by the court was followed by cross-examination; viz.

Q. The first thing Smith said to you after he started to talk to you about the land deal was that he would give you $27.50 for the half section, and $30 for the Bursell land?

A. Yes.

Q. And that he thought that would clean up all your deals and leave you some money?

A. Smith didn't say he thought.

Q. He didn't?

A. No.

Q. How did Smith know of your other debts here?

A. *He didn't agree to clear my other debts.*

Then the payment by defendant of certain debts of plaintiff in considerable amounts was gone into, and plaintiff was excused without in any way qualifying the foregoing testimony as to the transaction, except that he testified that after the transfer the note for $2,814 was given to cover up his property therein mortgaged to hinder other creditors in the collection of their claims, not that he owed that amount to Smith.

Mrs. Shobe, plaintiff's wife, was then called, testified to the defendant's dealing for the land at their home with herself, her husband, son, and daughter present.

She gives her version of the transaction as follows:

Q. Now, what talk was it that Smith had with you and your husband at that time?

A. Well, he says, "I came out this morning," he says, "and we have got this deal all figured out." "Now," he says, "I will explain it. Now, I want you to listen and understand it," and he says, "now, I will clear all your stuff, you will have that clear, and I will give you $900 *out of the Bursell quarter,* and your half the crop." And he says, "Now, what do you think about it Mrs. Shobe?" And I says, "Well, Mr. Smith, I hate to give up my home, but to get this big burden off our hands I am willing to do it. I certainly am because it worries me."

Q. What, if anything, did he say about closing the deal?

A. Well, he says, "You folks' can come down and we will close the deal at that figure."

Later in the fall they went to his office at the bank.

Q. And what did you do and what was said between Mr. Smith, you, and Mr. Shobe (in the bank)?

A. Well, we simply signed our rights away to the farm, and we had a friendly conversation, and that was about all. Smith says, "If you can sell this land now, all of it, for $30 an acre, I will get you the finest dress you ever had."

Q. Did he say anything about the mortgage, the chattel mortgage?

A. Well he said he still held this "to keep your creditors off, so that they can't come in and take anything from you," "your outside creditors," he called them.

The following is the entire cross-examination of Mrs. Shobe:

Q. You were present, Mrs. Shobe, were you not, when Mr. Smith told Mr. Shobe, as he testified to here on the stand, that Mr. Smith would give him $27.50 an acre for the half section?

A. Yes.

Q. And that he would give him $30 an acre for the Bursell land?

A. Yes.

Q. And that is what Smith said he would give you for that land, isn't it?

A. Yes, it is.

The daughter, Lena Shobe, was next called, and testified to the offer of Smith to Shobe at the farm, as explained to her mother by Smith, to be as follows:

So, after that Smith says, "Now, Mrs. Shobe, the two home quarters I will take at the consideration of $27.50 per acre, and the Bursell quarter at $30 an acre," and then he says, "I will clear all the debts you owe me personally and I will give you $900 besides." "Now," he says, "do you think that would—this would fix it all right? that you can get along with that?" And mama said she thought they could and would be pleased to do that,—that, of course, it was hard to give up the home.

Q. And was there anything said about the crop at that time?

A. Not in my presence or at my recollection.

Q. You don't remember that?

A. No, I do not.

Witness then testifies to an occurrence in May, 1913, six or seven months after the transfer had been made, when Shobe gave Smith a chattel mortgage to secure the $2,814 note, in which Smith said in the presence of the witness: "'Well, our mortgage has expired and had you better not renew the mortgage.' He said, 'And I will hold it for you so as to prevent other outside creditors from coming in and trying to take any of the things or securing a mortgage on them,' and papa considered it a favor of him; he said that he would renew the mortgage to Smith, and Smith says, 'Now, not that you owe me,' he says, 'but simply to hold off the other creditors.' So brother and I signed the mortgage (as witnesses) under those circumstances and to that effect."

Under cross-examination Lena testified as follows:

Q. Smith did say he would give you a consideration of $27.50 an acre for the half section,—that was the home place, wasn't it?

A. Yes.

Q. And that he would give you $30 an acre for the Bursell land?

A. Yes.

Q. Did Smith tell any of you there at your place how much your father owed him at that time?

A. Not in my recollection.

Q. He didn't say how much?

A. Not that I remember.

Q. Did they talk over the debts that your father owed to the other people aside from Smith?

A. No, they did not in my presence that I remember of.

The son, Claude Shobe, present at the time of the transaction, gave the following testimony:

Examination by the Court:

Yes, just give the conversation back and forth, and then the jury can say just what agreements they did make.

He (Smith) said, "Mr. Shobe, I come out this morning to see if you would be satisfied to sell the two home quarters for $27.50 an acre, and the Bursell quarter for $30 an acre. And that will clear up all your debts that I have against you, and I will give you $900 on the Bursell quarter."

Q. Was there anything said about half the crop?

A. Yes. He said that Pa would have his half of the crop that was on the land.

His cross-examination was as follows:

Q. Smith said that he would give your father $27.50 for the half section?

A. For the home, yes, sir.

Q. Half section?

A. Yes.

Q. And that he would give your father $30 an acre for the Bursell land?

A. Yes.

Q. Did I understand you to testify that Smith was to give your rather $27.50 for this half section?

A. Yes.

Q. And $30 an acre for the Bursell land?

A. Yes.

Q. And that in addition to that he was to take care of all indebtedness and liens against this property?

A. No, sir. He was just—in order—the way that father sold Smith that land was to clean up *what father owed Smith*.

Q. What was said, if anything, with respect to mortgages and liens, etc., that were against this property?

A. Yes, sir. That it would clean up those mortgages that was *against the property;* that father would be clear with them.

Q. That Smith was to pay those out of this money, is that it? That. is, the consideration was $27.50 an acre, and $30 an acre so far as you know?

A. Yes.

Q. What did Smith say about the mortgages, if anything?

A. Well, all that I heard Smith say was that he would clean up; everything that father owed him and give him $900 in money and his. half of the crop for that year.

Q. I thought he was to give your father $27.50 an acre for the half section?

A. Yes, he was.

Q. And $30 an acre for the 133 acres?

A. Yes.

Q. That was the basis of the deal, was it?

A. Yes.

Q. And you are positive that was all that was said about the real' property mortgages and the balance due on the Bursell contract?

A. Yes.

Q. And all that was said about the mortgages and account that your father owed Smith.

A. Yes.

Thereupon plaintiff rested his case.

Smith, in defense, testifies that in the year of 1911 "I offered him

$27.50 on the half section on which he was living, and $30 an acre for the 133 acres. I was to take it and pay off all indebtedness and liens there were against it, and credit the balance to what he was owing me." There was no agreement with regard to the crop. He produced his books and proved that the full amounts of the contract prices of these tracts had been applied upon debts owing him from plaintiff and upon liens and encumbrances upon the land paid to perfect title. The proceeds of two carloads of wheat sold that winter were also applied on plaintiff's account. That at the request or order of Shobe, $2,681 of the latter's debts to other parties, particularly specified, were paid by Smith and charged to Shobe's account, leaving a balance owing by Shobe to Smith on January 24, 1912, of $2,814, for which amount a note dated January 2, 1912, was subsequently taken. That $6,614.57 was owing by Shobe in encumbrances on the land; that from the Bursell land plaintiff received a credit on his indebtedness of $1,060.52 for his equity therein, on the half section $5,567.53 for the purchase price over encumbrances; that plaintiff was owing defendant on open account over $1,100, inclusive of interest, which, together with twenty-seven other items of bills paid to others and cash advanced to plaintiff, left plaintiff owing defendant $2,814 in January, 1912. Plaintiff's books of account were produced and examined for years back, or since 1904, and were checked as correct by plaintiff's attorney as defendant was cross-examined by him. That on May 22, 1912, a chattel mortgage was given by Shobe to Smith securing the note for $2,814, dated January 2, 1912.

The trial court submitted the case to the jury and in doing so outlined the plaintiff's claim as follows: "The claim of the plaintiff is this: That on or about the month of July, 1911, he made a contract with Smith whereby he agreed to transfer all of his title to three quarter sections of land to Smith, and as a consideration for that transfer that Smith was to assume and pay all of the debts of whatever description against the land, and that he was to release all of the debts which Shobe owed him personally, and that he was to give Shobe $900 in money in addition to that, and that Shobe was to give him half of the crop raised on the land in 1911; and that Shobe says that Smith has failed to pay him the $900 in money."

The question presented is whether under this testimony as narrated,

which fully reflects the issue, there is any proof sufficient to sustain a verdict that there was such an agreement as is set forth in plaintiff's complaint. Did defendant agree to take this property and satisfy his liens and indebtedness against the property and give plaintiff $900 more in any event? The learned trial court who heard the proof, upon a careful consideration of all the testimony, held that there was no evidence upon which to base the finding of the jury in plaintiff's favor that such was the contract. And we come to the same conclusion. All parties agree that the sale was made at a stipulated price per acre as to each particular tract; that no computation of indebtedness of Shobe to Smith was made at that time; that $900 would be about the amount that would be left over from the equity in the Bursell land, and when considered with the fact that the witnesses were testifying to matters occurring between three and four years before, and taken in connection with the admitted credits given for the full amount due under the contract; that defendant at plaintiff's request had subsequently paid $2,681 of Shobe's debts to others in excess of the stipulated price per acre, and that the full amount for which the note is given, $2,814, is owing; that the many items making up said indebtedness are admittedly debts of Shobe; that the question of accounting also enters in as a part of the transaction as a contemporaneous interpretation by the parties of their transaction; that the testimony of the plaintiff, as given on his cross-examination by the court, is in virtual agreement with that of his wife, his daughter, and his son; and that all are in entire harmony with the defendant's version of the basis of the purchase being a stipulated price per acre. True, plaintiff and his witnesses testified Smith also stated, "I will give you $900 on the Bursell quarter" and "the half of the crop." This statement may have been made by Smith. It does not alter the situation. About that amount in fact would be coming from the proceeds of the Bursell quarter and be about what would be left Shobe from the sale, inasmuch as the equity from the half section just about squared accounts and the amount of plaintiff's equity in the Bursell quarter was but little in excess of $900. As to the half of the crop incident, two carloads of wheat were delivered that winter and are accounted for, assuming that this agreement took place, which the daughter did not hear. This statement of these two circumstances, though made, cannot be considered in the light of all the facts as suffi-

cient to sustain the jury's verdict in plaintiff's favor, finding to the effect that this land was not sold at a stipulated price per acre as a basic price or consideration for the sale, with the proceeds to be applied on an uncalculated and concededly large indebtedness owing defendant; but instead was a sale to square accounts for an unspecified amount, but with $900 over to be paid in any event as found by the jury. Much is made by plaintiff of the testimony given by him and his family that after the transfer the note and mortgage for $2,814 were taken to cover up Shobe's property, that his "outside creditors" could not collect of him; that Smith took this note and mortgage to help Shobe beat his creditors instead of for any debt Shobe owed Smith. Shobe and his wife both place it as taking place at the bank when the transfer had been made, in October, 1911. Lena has it occurring at the farm in May, 1912, the date of the mortgage. In any event, concededly it was four to ten months after the contract in July, 1911, was made for the sale of the farms, and goes only to a matter long subsequent to the entering into of the contract, the terms of which contract are the matter for determination. Such an agreement has no bearing whatever upon Smith's liability or nonliability under the contract of sale. If he has defrauded Shobe since the latter sold him his land, Shobe has his remedy in an action for an accounting for transactions occurring subsequently to and wholly independent of the sale of this land, and apart from the present issue of what were the terms of that contract. True, the parties evidently have submitted all matters between them, and have on argument asked that we determine whether the $2,814 note is bogus, or was given for that amount as a consideration; but such issues are foreign to the real issue, except as incidentally brought in collateral to defendant's explanation of where the consideration for the purchase went and to whom it was paid. We may in justice to Smith state that if we were to pass upon the validity of said note for $2,814, the testimony upholds it as against the conclusions or inferences testified to by plaintiff and members of his family to the contrary. Admittedly Shobe owed the items of debt of $2,681 going to make up that amount and paid by defendant after the transfer, and when under the plaintiff's own complaint defendant had not agreed to pay them, inasmuch as none of them were owing to Smith and were not liens against the land purchased. Plaintiff testified: "He (Smith) didn't agree to clear my other

debts," aside from those secured on the land and owing Smith. Yet Shobe complains that his note is without consideration, when Smith, at his request as a favor to him, has taken up and paid $2,681 of such outstanding debts, which Smith's land deal in nowise obligated him to pay. If it be assumed that one was for a mechanics' lien for $171, still $2,510 of other debts were paid by Smith for which he has not been repaid. Shobe, without denying that he owes these amounts for which account had been rendered him by Smith years before this suit was brought, nevertheless contends that the note given for their payment is without consideration,—a claim well-nigh preposterous if any regard is had to the evidence. Plaintiff admits he cannot figure. He "never got to go to school." His counsel reiterate his statement, "I am a man that can't figure," yet not a single transaction is shown where he has been overreached or defrauded. On the contrary, Smith has fully accounted for everything and traced to the origin every claim, until counsel has admitted that his accounts year by year since 1904, nearly up to this transaction in question, are correct. When everything is considered, there is no substantial or tangible proof on plaintiff's side of the issue. The judgment is affirmed.